**Kirk JACOBS, Plaintiff,**

v.

**DISTA PRODUCTS COMPANY and Eli Lilly and Company, Defendants.**

**No. C87–1007–K.**

United States District Court,
D. Wyoming.

Sept. 7, 1988.

James R. McCarty, Casper, Wyo., for plaintiff.

J.N. Murdock, Casper, Wyo., for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH FINDINGS

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court on defendants' motion for summary judgment or, alternatively, for partial summary judgment; plaintiff appearing by and through his attorney, James R. McCarty; defendants appearing by and through their attorney, J.N. Murdock; and the Court having heard the arguments of counsel and having fully and carefully reviewed and considered the motion and brief filed therewith and all matters pertinent thereto, and being fully advised in the premises, FINDS:

Plaintiff Jacobs brings this personal injury and products liability action against a drug manufacturer and a distributor, alleging that his health problems arose as a result of a prescription drug manufactured and distributed by defendants. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

In late 1982, after injuring his right foot, plaintiff was seen by his physician, Dr. Miller, and the decision was made that an operation was necessary. A short time following the operation, plaintiff developed a

boil on his foot. Being hundreds of miles away from Dr. Miller's office, plaintiff went to a nearby physician who prescribed erythromycin. This antibiotic proved ineffective against the infection and plaintiff was told to return to Dr. Miller in Laramie, Wyoming.

Upon seeing Jacobs, Dr. Miller determined that the proper treatment would be the prescription drug Keflex. Within weeks following usage of Keflex, Jacobs was diagnosed as having pseudomembranous colitis compounded some months later with diagnoses of inflammatory bowel disease, sensitivity to monosodium glutamate, and irritable bowel disease.

In his complaint, plaintiff claims that these health problems arose as a direct and proximate consequence of using Keflex and seeks damages upwards of $9,000,000 against the drug's manufacturer and distributor based upon three theories. Plaintiff's first contention is that defendants failed to adequately warn physicians and potential users of Keflex as to the possible side effects associated with its use. Secondly, plaintiff charges that defendants breached implied warranties of fitness and merchantability, warranties upon which he relied to his detriment. Finally, plaintiff raises a strict liability claim holding defendants liable for distributing a drug dangerous and unfit for human consumption.

Defendants counter that plaintiff assumed the risks which he encountered when he began using Keflex. It is defendants' position that, as applies to them, only two issues are outstanding: (1) the duty owed by Eli Lilly and Dista to plaintiff and (2) whether that duty has been breached.

Defendants urge that as drug manufacturers and distributors their duty to warn extends only to physicians who in turn, based upon knowledge of their own patients, bear the final responsibility for the decision to prescribe as well as to warn the patient of possible side effects. Based upon this so-called "learned intermediary" doctrine which a majority of states have adopted, defendants claim they had no duty to warn which extended to plaintiff and so there could not have been a breach. More-

over, in conjunction with this doctrine, defendants note for the Court that plaintiff, prior to instituting this suit, filed a suit against his prescribing physician in state court from whom he obtained a settlement. At the oral hearing on defendants' summary judgment motion, counsel for the parties indicated that there was no dispute as to the propriety of the "learned intermediary" rule.

With this in mind, the Court perceives the sole dispositive issue for determination to be the adequacy of the warnings provided to the prescribing physician. Before turning to this issue, the Court addresses plaintiff's claims centering on strict liability.

The scope of strict liability has been explained as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965). The State of Wyoming recently joined the clear majority of states which have adopted § 402A *in toto*. *See Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 341 (Wyo.1986).

Directly pertinent to the matter at bar is whether Keflex constitutes a product sold in a "defective condition unreasonably dangerous to the user or consumer...." One of the comments which follow § 402A ad-

dresses strict liability in the context of a product which is unavoidably unsafe:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An ... example is the vaccine for the Pasteur treatment of rabies.... Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Restatement (Second) of Torts § 402A comment k (1965) (emphasis in original).

The clear import of the above-quoted passages is that manufacturers of prescription drugs cannot be held accountable under a strict liability theory for injuries which might result from their use so long as adequate warnings are provided to enable a prescribing physician to weigh on a patient-by-patient basis the benefits of a drug's use against the attendant risks. Under these circumstances, the drug will not be considered unreasonably dangerous. Thus, whether strict liability is available as a legal cause of action to plaintiff requires that the focus of attention now turn to the adequacy of the warning provided to plaintiff's prescribing physician.

■ When sitting in diversity, a federal court must apply the law of the forum state as declared by that state's highest court or through legislation. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). This Court is unable to find a Wyoming decision which qualifies as precedent on this specific issue. Where no state court has addressed clearly the matter involved in a diversity action, this Court must make the best estimate of how the state's highest court would rule. *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir.1988). The Court may look to other decisions of Wyoming courts, decisions of other state courts, federal decisions, and general weight and trend of authority. *Hartford v. Gibbons & Reed Co.*, 617 F.2d 567, 569 (10th Cir.1980).

Wyoming case law most closely related to the extent of a manufacturer's duty to warn is found in actions where defective design has been alleged. In *O'Donnell v. City of Casper*, 696 P.2d 1278 (Wyo.1985), a motorcyclist who collided into a parked vehicle and became engulfed in flames after encountering a patch of loose gravel on a city street sued the city for negligent maintenance on its streets and sued the manufacturer of the motorcycle for defectively designing the fuel system. Reversing the district court's grant of summary judgment for the manufacturer, the Wyoming Supreme Court concluded:

> A manufacturer owes a duty of care to those who use its product.
>
> . . . .
>
> Appellant's expert testified ... that as a result of tests conducted in Japan, the United States, and England, Suzuki had knowledge of the fire hazards associated with motorcycle accidents and failed to warn users against filling the fuel tank to capacity. This testimony presents a question of fact as to the extent of Suzuki's knowledge concerning the integrity of its fuel system in the event of an accident. This factual matter bears on the issue of whether Suzuki breached its duty, recognized by this court in *Parker v. Heasler Plumbing & Heating Co.*, Wyo., 388 P.2d 516 (1964), *to warn users of known, latent dangers.*

*O'Donnell*, 696 P.2d at 1285, 1287 (emphasis added).

In the *Parker* case cited in *O'Donnell*, a school cafeteria employee sued the installer of an incinerator for, *inter alia*, failure to

post warning instructions detailing the proper use and operation of the incinerator after she overloaded the incinerator with milk cartons and other refuse, causing a sudden burning when the door of the incinerator was opened. Citing with approval decisions from other jurisdictions, the Court affirmed the grant of summary judgment for defendant and reiterated:

> [T]he manufacturer or seller of a machine, dangerous because of the way in which it functions ... owes to those who use it a duty merely to make it free from latent defects and concealed dangers. (Citation omitted.)
>
> . . . .
>
> In cases dealing with a manufacturer's or seller's liability for injuries to remote users, the courts have generally stressed the duty of guarding against *hidden* defects and of giving notice of *concealed* dangers. (Citations omitted.)

*Parker*, 388 P.2d at 518 (emphasis in original).

Evidence in *Parker* showed that the manufacturer indeed furnished complete operating instructions to defendants who in turn provided them to the school district as well as instructing other personnel, including plaintiff, against overloading the incinerator and against looking inside to see if the refuse was burning.

In the case at bar, defendants have provided the Court with the package insert to physicians as it appeared at the time plaintiff began using Keflex. The pertinent portions of that insert follow:

### CONTRAINDICATION

Keflex is contraindicated in patients with known allergy to the cephalosporin group of antibiotics.

### WARNINGS

BEFORE CEPHALEXIN THERAPY IS INSTITUTED, CAREFUL INQUIRY SHOULD BE MADE CONCERNING PREVIOUS HYPERSENSITIVITY REACTIONS TO CEPHALOSPORINS AND PENICILLIN. CEPHALOSPORIN C DERIVATIVES SHOULD BE GIVEN CAUTIOUSLY TO PENICILLIN-SENSITIVE PATIENTS.

SERIOUS ACUTE HYPERSENSITIVITY REACTIONS MAY REQUIRE EPINEPHRINE AND OTHER EMERGENCY MEASURES.

There is some clinical and laboratory evidence of partial cross-allergenicity of the penicillins and the cephalosporins. Patients have been reported to have had severe reactions (including anaphylaxis) to both drugs.

Any patient who has demonstrated some form of allergy, particularly to drugs, should receive antibiotics cautiously. No exception should be made with regard to Keflex.

Pseudomembranous colitis has been reported with virtually all broad-spectrum antibiotics (including macrolides, semi-synthetic penicillins, and cephalosporins); therefore, it is is important to consider its diagnosis in patients who develop diarrhea in association with the use of antibiotics. Such colitis may range in severity from mild to life-threatening.

Treatment with broad-spectrum antibiotics alters the normal flora of the colon and may permit overgrowth of clostridia. Studies indicate that a toxin produced by *Clostridium difficile* is one primary cause of antibiotic-associated colitis.

Mild cases of pseudomembranous colitis usually respond to drug discontinuance alone. In moderate to severe cases, management should include sigmoidoscopy, appropriate bacteriologic studies, and fluid, electrolyte, and protein supplementation. When the colitis does not improve after the drug has been discontinued, or when it is severe, oral vancomycin is the drug of choice for antibiotic-associated pseudomembranous colitis produced by *C. difficile*. Other causes of colitis should be ruled out.

. . . .

### PRECAUTIONS

*General Precautions*—Patients should be followed carefully so that any side effects or unusual manifestations of drug idiosyncrasy may be detected. If

an allergic reaction to Keflex occurs, the drug should be discontinued and the patient treated with the usual agents (e.g., epinephrine or other pressor amines, antihistamines, or corticosteroids).

Prolonged use of Keflex may result in the overgrowth of nonsusceptible organisms. Careful observation of the patient is essential. If superinfection occurs during therapy, appropriate measures should be taken.

. . . .

Keflex should be administered with caution in the presence of markedly impaired renal function. Under such conditions, careful clinical observation and laboratory studies should be made because safe dosage may be lower than that usually recommended.

. . . .

Broad-spectrum antibiotics should be prescribed with caution in individuals with a history of gastrointestinal disease, particulary colitis.

. . . .

### ADVERSE REACTIONS

*Gastrointestinal*—Symptoms of pseudomembranous colitis may appear either during or after antibiotic treatment. Nausea and vomiting have been reported rarely. The most frequent side effect has been diarrhea. It was very rarely severe enough to warrant cessation of therapy. Dyspepsia and abdominal pain have also occurred.

*Hypersensitivity*—Allergies (in the form of rash, urticaria, and angioedema) have been observed. These reactions usually subsided upon discontinuation of the drug. Anaphylaxis has also been reported.

Other reactions have included genital and anal pruritus, genital moniliasis, vaginitis and vaginal discharge, dizziness, fatigue, and headache. Eosinophilia, neutropenia, and slight elevations in SGOT and SGPT have been reported.

Warnings akin to these were also found in the Physicians Desk Reference (PDR) and are the product of some of the most comprehensive and stringent regulatory schemes ever enacted by a federal agency. The Food and Drug Administration (FDA) is responsible for enforcing these regulations. *See* 21 C.F.R. §§ 200–499 (1988). The format of the insert excerpt reproduced above tracks the regulatory requirements. *See* 21 C.F.R. §§ 201.56 and 201.-57. Regulated is every conceivable aspect of prescription and over-the-counter drugs from application for FDA approval and correct letter size and color for particular warnings to physicians in the case of prescription drugs to continual reports to FDA by manufacturers of FDA–approved drugs as to newly discovered and scientifically borne out adverse reactions. The burdens which confront an applicant before a proposed drug will be FDA approved are explained thus:

FDA will approve an application after it determines that the drug meets the statutory standards for safety and effectiveness, manufacturing and controls, and labeling.... FDA is required to exercise its scientific judgment to determine the kind and quantity of data and information an applicant is required to provide for a particular drug to meet them.....

21 C.F.R. § 314.105(c).

Numerous cases hold that a drug manufacturer is required to warn only of those adverse effects of which it knows or reasonably should know. *See, e.g., Needham v. White Laboratories, Inc.,* 847 F.2d 355, 357 (7th Cir.1988); *Guevara v. Dorsey Laboratories,* 845 F.2d 364, 367 (1st Cir.1988); *Swayze v. McNeil Laboratories, Inc.,* 807 F.2d 464, 469 n. 5 (5th Cir.1987), *reh'g denied,* 812 F.2d 1405 (5th Cir.1987); *Kehm v. Procter & Gamble Mfg. Co.,* 724 F.2d 613, 621 (8th Cir.1983); *Stanback v. Parke, Davis and Co.,* 657 F.2d 642, 644 (4th Cir.1981); *Dalke v. Upjohn Co.,* 555 F.2d 245, 248 (9th Cir.1977); *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132, 142 (3rd Cir.1973); *Martinkovic by Martinkovic v. Wyeth Laboratories, Inc.,* 669 F.Supp. 212, 215 (N.D.Ill.1987); *Graham by Graham v. Wyeth Laboratories,* 666 F.Supp. 1483, 1498 (D.Kan.1987); *Polley v. Ciba–Geigy Corp.,* 658 F.Supp. 420, 421 (D.Alaska

1987); *Weinberger v. Bristol–Myers Co.,* 652 F.Supp. 187, 190 (D.Md.1986); *Williams v. Lederle Laboratories,* 591 F.Supp. 381, 384 (S.D.Ohio 1984); *McElhaney v. Eli Lilly & Co.,* 575 F.Supp. 228, 231–232 (D.S.D.1983), *aff'd,* 739 F.2d 340 (8th Cir.1984); *Stanback v. Parke, Davis & Co.,* 502 F.Supp. 767, 770 (W.D.Va.1980); *Tinnerholm v. Parke, Davis & Co.,* 285 F.Supp. 432, 451 (S.D.N.Y.1968), *aff'd,* 411 F.2d 48 (2nd Cir.1969); and *Stromsodt v. Parke–Davis & Co.,* 257 F.Supp. 991, 997 (D.N.D.1966), *aff'd,* 411 F.2d 1390 (8th Cir. 1969).

Implicit in this holding is a continuing duty of drug manufacturers to provide notification of side effects subsequently discovered. *Stanback,* 502 F.Supp. at 770. The manufacturer is not required to warn of unknown or unforeseeable risks. *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377, 381 (D.Md.1975), *aff'd,* 567 F.2d 269 (4th Cir.1977).

■ To decide whether the warnings given by defendants to the prescribing physician were adequate, the Court must look back to 1983 when Keflex was prescribed for plaintiff until he discontinued using it. The state of medical knowledge at that time will directly affect a decision on the adequacy of defendants' warnings. In support of his position that the warnings provided were inadequate, plaintiff submits a plethora of computer-generated information containing complaints by users of Keflex as to adverse reactions they claim arose from its use. While pseudomembranous colitis was reported by many individuals, the information reveals that a comparatively small number of individuals claimed such maladies as hiccups, alcohol intolerance, dream abnormalities, hallucinations, pain, acne, and even body odor. However, as the cover letter to this voluminous information indicates, this represents raw information which has not all been scientifically or otherwise verified and thus cannot be used to estimate the incidence of adverse drug reactions.

Whether plaintiff actually had pseudomembranous colitis is questioned by a consulting gastrointestinal specialist. *See*

Bush Dep.Exh. 3. Assuming plaintiff had colitis, there is no indication that all other possible causes have been ruled out. The evidence is undisputable that defendants knew of the possibility that use of Keflex might result in some users developing pseudomembranous colitis at the time Keflex was prescribed for plaintiff and they included an appropriate warning to that effect. In fact, the physician is put on notice that use of Keflex in some instances might produce colitis which is life threatening. Defendants detailed for the physician the effect Keflex has on the bacterial population of the colon. Accompanying these warnings were detailed instructions as to appropriate procedures for dealing with the onset of side effects.

Deposition testimony of plaintiff's current treating physician, Dr. Bush, indicates that the warnings were adequate. Bush Dep. at 45–46. Additionally, defendants submitted the affidavit of Dr. Lyford, who reviewed plaintiff's medical records and the package insert and concluded that the warnings provided to the prescribing physician when Keflex was prescribed were adequate to alert doctors to the dangers associated with its use. Lyford Affidavit at ¶ 10. The only expert evidence plaintiff provides to refute this is the affidavit of Dr. Honea which states, in pertinent part:

> I have reviewed the product insert for the drug Keflex, and it is my opinion, based upon reasonable medical certainty, that the medical problems experienced by Kirk Jacobs as a result of the use of the drug Keflex, are not particularly described with respect to extent and duration in the warnings provided in the product insert.

Honea Affidavit at ¶ 7.

Plaintiff's reliance upon this testimony as supportive of the inadequacy of the warnings is misplaced. This testimony does not create a genuine factual dispute on the adequacy issue; rather, the extent of its value is simply as confirmation that the particular group of symptoms found in plaintiff were not warned of in the insert. Plaintiff brings forth no evidence showing that defendants knew or reasonably should

have known of reactions such as his associated with the use of Keflex. Neither is plaintiff able to show that such a reaction was widely reported in scientific circles prior to plaintiff's use of Keflex. Contrarily, defendants have furnished expert testimony showing that plaintiff's adverse reactions were not widely known of in the scientific community:

> It is ... [my] opinion that the complex of symptoms presented by Mr. Jacobs after September of 1983 represents a complex that is unique and which has not previously been reported or expected from the ingestion of drugs such as KEFLEX if, indeed, any relationship exists between the complex of symptoms and the use of KEFLEX.

Lyford Affidavit at ¶ 15.

On this same issue, the following colloquy occurred between defense counsel and Dr. Bush:

> Q. In terms of the atypical case of colitis and what you have seen since the ingestion of Keflex, as I understand it, in your own knowledge you really are not aware of any syndrome, condition, or description of a disease or symptom such as that; is that correct?
>
> A. I am not at all aware of any syndrome like that.
>
> Q. Would it be fair to say at least that it's something that is not widely known within the medical community if it's known at all?
>
> A. If it's known at all, it is certainly not widely known.
>
> Q. Do you have any evidence or indication that such a reaction has ever been reported in journals or otherwise?
>
> A. I have never heard of a case report of anything approaching this symptom complex.

Bush Dep. at 46–47.

To prevail on a motion for summary judgment, the movant must demonstrate to the Court that there exist no genuine issues of material fact and that he is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c). A dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Similarly, facts are material only if they "might affect the outcome of the suit...." *Id.*

The Court must view the pleadings, affidavits, and depositions in the light most favorable to the party opposing the motion, *Burnette v. Dresser Industries, Inc.,* 849 F.2d 1277, 1284 (10th Cir.1988), and resolve any reasonable inferences therefrom in the nonmovant's favor. *Wheeler v. Hurdman,* 825 F.2d 257, 260 (10th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 503, 98 L.Ed. 2d 501 (1987).

If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is the appropriate mode of disposition. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Based upon the foregoing, application of these standards to the facts and circumstances of this case make the matter ripe for summary judgment. Plaintiff has brought forth no expert willing to testify that the warnings as they existed back in 1983 were inadequate. On the other hand, defendants have produced expert testimony that, in fact, the warnings were adequate.

The drug manufacturer specifically warned that a possible side effect of Keflex is pseudomembranous colitis. For a prescription drug to be approved for public use, its utility for treating diseases must outweigh any detrimental effects which may arise from its use. By allowing Keflex to be marketed and sold, the FDA has determined that a legitimate public interest in its availability outweighs any adversities which might arise in the course of its usage. This Court is not in a position to second-guess such a determination.

The time is not yet here, and perhaps never may be, when drug manufacturers are able to eliminate all possible hazards of their products. There is wisdom in a quo-

**1036**

tation borrowed by the Wyoming Supreme Court some thirty years ago:

> '[A] manufacturer cannot manufacture a knife that will not cut or a hammer that will not mash a thumb or a stove that will not burn a finger.'

*Parker,* 388 P.2d at 518 (quoting *Jamieson v. Woodward & Lothrop,* 247 F.2d 23, 26 (D.C.Cir.1957), *cert. denied,* 355 U.S. 885, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957)).

Generally, ultimate consumers are made aware of the side effects through their physicians and through the process of informed consent decide that the benefits of a particular drug outweigh chances of an adverse reaction. Defendants communicated adequate warnings to plaintiff's prescribing physician and the duty to warn his patient rested upon his shoulders alone. The drug manufacturer's liability to plaintiff ended when it imparted adequate warnings to the physician.

From the decisions cited and in view of the general trend across the country, as well as Wyoming's adoption of § 402A and its comments and similar case law, it is the opinion of this Court that if the Wyoming Supreme Court had before it the precise issue upon which this Court now rules, its decision would essentially mirror this holding. Due principally to Wyoming's acceptance of comment k and this Court's holding on the adequacy issue, defendants are insulated from liability premised upon a breach of warranty theory as well.

NOW, THEREFORE, IT IS

ORDERED that defendants' motion for summary judgment be, and the same is, hereby granted.