Anthony F. SEARS, Plaintiff,

v.

**AMOCO PRODUCTION COMPANY,**
**Defendant.**

No. 96–CV–283–J.

United States District Court,
D. Wyoming.

June 13, 1997.

Charles Michael Aron, Aron & Hennig, Laramie, WY, for Plaintiff.

Bradley T. Cave, William R. Dabney, Holland & Hart, Cheyenne, WY, for Defendant.

### *JUDGMENT IN FAVOR OF DEFENDANT*

ALAN B. JOHNSON, Chief Judge.

The court having granted defendant Amoco Production Company's Motion for Summary Judgment, it is therefore

ORDERED, ADJUDGED AND DECREED that the plaintiff Anthony F. Sears recover nothing of defendant Amoco Production Company and that judgment be, and hereby is entered in favor of defendant Amoco Production Company. It is further

ORDERED, ADJUDGED AND DECREED that defendant, as the prevailing party, recover from plaintiff its costs.

### *ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

This matter is before the court on defendant's Motion for Summary Judgment. The court has considered the entire file and is fully advised.

### INTRODUCTION

This diversity case requires the court to apply Wyoming law to plaintiff's claims stemming from his employer's firing him on October 21, 1992.

Plaintiff brings three claims under Wyoming law: wrongful termination, breach of contract, and breach of the covenant of good faith and fair dealing.

Defendant moves for summary judgment on all three claims.

### UNDISPUTED FACTS

Plaintiff Anthony F. Sears was employed by defendant Amoco Production Company (Amoco) from December 1974 until October 22, 1992, as an oil field production operator.

Plaintiff's career with Amoco did not run smoothly. Although he submits documentation showing that he was skilled and was a hard worker, plaintiff's files also show complaints that he was insubordinate and had a poor attitude. Occasionally there were complaints about his job performance. In 1987, plaintiff received a disciplinary warning letter for continued unsatisfactory performance. Plaintiff disputed that he had an attitude problem as charged by his supervisors and filed an internal Amoco grievance charging the complaints were intentional harassment and false criticisms. When that grievance was unsuccessful, he transferred to the Salt

Creek oil field to get away from that supervisor.

Between 1988 and 1990 plaintiff worked at Salt Creek, where his immediate supervisor was Jim Trantham. Initially, things went well at the Salt Creek field and Mr. Trantham gave plaintiff positive job evaluations until the spring of 1991. Plaintiff and Mr. Trantham developed problems working together and plaintiff requested a transfer. The transfer was denied and the problems escalated. Plaintiff contends that the problems were the result of his supervisors and others deliberately harassing him. Plaintiff says that the harassment began when he called Mr. Trantham unethical. On September 4, 1991, plaintiff received a warning letter outlining two incidents of insubordination. Def.'s Ex. A–2. Plaintiff maintains that the incidents were manufactured as part of an attempt to get rid of him. On September 9, 1991, plaintiff received a five-day suspension for insubordination arising from a new incident that occurred the day after he received the warning letter. Def.'s Ex. A–4. Plaintiff maintains that the suspension was unwarranted and that the incident was "nothing more than a misunderstanding." Plaintiff again filed an internal Amoco grievance and was again unsuccessful. Def.'s Ex. A–5.

In October of 1991, Mr. Trantham prepared an interim performance review for plaintiff that was a mix of negative and positive comments. Def.'s Ex. B–3. The review noted plaintiff's "excellent job knowledge and skills" and also that he showed a positive change in attitude after returning from his five-day suspension. Plaintiff disagreed with much of the evaluation and commented on the bottom of the evaluation "... the insubordinate charge is not true.... I believe this document to be negative and another form of harassment." *Id.*

On November 20, 1991, plaintiff's supervisor accused him of not responding appropriately when a paging service telephoned his house to call him out because of a tank alarm at the oil field. Def.'s Ex. A–6. Plaintiff met with his supervisor Mr. Colclasure. Plaintiff tape recorded that conversation. Pl.'s Ex. H. The transcript reveals that plaintiff's attitude about the investigation was belligerent, threatening, and totally uncooperative. Plaintiff refused to answer clearly the questions under investigation—whether he was at home and refused to come to the phone during the call. *Id.* at 8. Instead, plaintiff maintained that he was being harassed. Plaintiff now says that he was not at home when the call came and that the whole incident was set up. Plaintiff's deposition at 434–36. Plaintiff received a final warning letter on December 2, 1991 telling him that any further misconduct would result in termination. Def.'s Ex. A.

Plaintiff's January 1992 evaluation was written by Mr. Trantham and again was a mix of positive and negative comments and opined about plaintiff's performance "considerable improvement is necessary in 1992." Def.'s Ex. B–4 at 4. Plaintiff responded that the charges were contrived and not true and were part of the constant harassment he was suffering. He also stated, "I have been accused of things I didn't do. I have also been shamed in front of my co-workers and my community for things I didn't do." *Id.* at 5.

In March of 1992, plaintiff went to work under a different supervisor, Corby Toman, who requested that plaintiff be on his crew because he had a reputation as a hard worker. Toman depo. p. 11. On September 16, 1992, Mr. Toman gave plaintiff a Notice of Unsatisfactory Performance and Demotion. Def.'s Ex. C–2. The notice stated: "Based on this notification and previous warnings and notifications of unsatisfactory performance you are subject to discharge at any time during this 60–day period if your performance is not maintained at a satisfactory level." The Notice also informed plaintiff: "You must show immediate improvement to a satisfactory level and demonstrate consistent performance at that level from this point on. Failure to meet these conditions will result in immediate termination of your employment."

Pursuant to the Notice and demotion, plaintiff was demoted to the next lowest salary class and his supervisor instituted an action plan that included daily job reviews with face to face feedback and written performance reviews on a weekly basis.

Plaintiff understood this letter to mean that he "was about to get fired." Plaintiff's depo. at 460. Plaintiff contends that there was nothing wrong with his performance, that this notice was just part of a paper trail to get rid of him and that the criticisms of his performance were contrived. *Id.* at 461.

On September 21, 1992, plaintiff's wife hand delivered two letters to Mr. Colclasure. The first was from Patricia A. Boyer, a marriage and family counselor. The Boyer letter stated:

Tony Sears was seen in consultation this morning regarding stress related disorders. I was very concerned about the intensity of stress that he appears to presently be experiencing and its potential impairment of his functioning and referred Mr. Sears to Dr. William Clapp for further evaluation and treatment of this problem. Since a significant portion of his problem appears to be emanating from his employment environment I would strongly recommended that he not be placed in any potentially stressful situations there until after Dr. Clapp has had an opportunity to complete his evaluation.

Pl.'s Ex. F.

The second document was a memo from plaintiff and his wife referencing the letter from Ms. Boyer.

The information in [the Boyer] letter is to be strictly confidential. Release of this information to anyone other than yourself within the Salt Creek Operations Center will require written permission from Tony. You may tell Corby Toman that he is not to confront Tony for the time being. Also, please inform Corby that if Tony walks out on a situation, Corby IS NOT TO FOLLOW HIM. Tony is using that as a release from the pressure and is leaving because he feels he cannot handle the situation. Following him into the parking lot as he has done in the past could have some serious consequences. If you have any questions concerning this, we are asking that you discuss it with Meredith [Sears] rather than Tony. She would be available anytime at your convenience. You may call her at work at [number]. I am attaching a release for you so you may show the Boyer letter to your Superiors in Denver or Chicago; but again I an asking that this information NOT BE RELEASED to anyone in Salt Creek other than yourself.

*Id.*

Significantly, the letters did not request leave on plaintiff's behalf. The memo also forbade Mr. Colclasure from sharing the information with anyone else, including Mr. Toman, the person that plaintiff knew would be reviewing his work on a daily basis and providing written feedback on a weekly basis.

In response to these letters, Mr. Colclasure arranged a meeting with plaintiff on September 23, 1997. Def.'s Exh. A at 2–3. Mr. Colclasure explained to plaintiff that he would keep the information confidential at Salt Creek, including from Mr. Toman, and that he would instruct Mr. Toman not to "follow" plaintiff if he walked away. Def.'s Ex. A p. 3. He also explained he could not guarantee an environment free of "stress," and that continued performance improvement and weekly evaluations would still be required. He asked plaintiff if he could continue to work under those conditions. Plaintiff responded that he was "trying." Mr. Colclasure told plaintiff to let him know if things became too stressful. Plaintiff did not request any kind of sick leave. *Id.*; Pl.'s Depo. at 477–480.

On October 12, 1993, after taking some time off for a hunting trip, plaintiff had an evaluation by a psychiatrist, Dr. William Clapp. Dr. Clapp diagnosed plaintiff as having depression, and prescribed Prozac to begin immediately. Dr. Clapp did not advise plaintiff to take leave from work, and did not believe that plaintiff would become violent as a result of his mental state. Clapp Depo. pp. 21–22; 39–40; 50.

Plaintiff returned to work on October 13, 1992, but did not tell anyone of Dr. Clapp's diagnosis or prescription. He did not ask for any leave. Pl.'s Depo. at 490–92. On that day Mr. Toman met with Plaintiff to discuss his performance for the week of September 28–October 2, 1992. See plaintiff's Depo. at 480–83; Def.'s Ex. C–3. Mr. Toman handed plaintiff the new written evaluation, which

described some improvements, and also some continued deficiencies. Def.'s Ex. C–4.

Plaintiff looked over the evaluation and became enraged. Toman Depo. p. 26. He yelled it was "bullshit" and "harassment." Def.'s Ex. C–1. He then turned toward Mr. Toman and slammed his fist on the table next to Mr. Toman. Then he slammed the door open, stepped in the next room and slammed his fist into a file cabinet, then came back and shouted face-to-face that Mr. Toman had better stay out of his way. Plaintiff moved off, then came back toward Mr. Toman while still shouting. The second time plaintiff moved back toward Mr. Toman, he left the building.

Mr. Toman did nothing during the incident other than to assure plaintiff he would stay out of his way.

Plaintiff does not deny being "verbally abusive" or "physically threatening," during the outburst. He claims not to recall his actions beyond being "angry." Plaintiff doesn't remember if he hit the file cabinet or not, but he does remember the pain shooting up his wrist during the incident. Pl.'s Depo. at 486–88. That night, plaintiff's wife looked at his hand and believed it was broken because it was so injured.

On October 13, 1992 Plaintiff was suspended without pay for his actions until Amoco decided what action to take. Def.'s Ex. A–7.

Subsequent to the suspension, Mr. Colclasure received a letter from plaintiff's psychiatrist, Dr. Clapp, dated October 14, 1992. That letter stated:

I saw Mr. Sears in a psychiatric evaluation on October 12, 1992. He is suffering from severe depression and does not appear to be capable of working at this point. I recommend that he be placed on a Medical leave of absence for the next four to six weeks. I have initiated antidepressant treatment and it is likely that he will show a good clinical response during the period he is on disability.

Pl.'s Ex. M.

Mr. Colclasure testified that he consulted with his superiors and Amoco's Human Resources department. The letter from Dr. Clapp was considered, but given plaintiff's history of discipline problems and his most recent violent outburst, the decision was made to terminate plaintiff. Def.'s Ex. A p. 3; Ex. A–8; Colclasure Depo. at 53–54; 57–58.

On October 21, 1992, Amoco sent plaintiff a termination letter stating he had violated four rules, any one of which was grounds for immediate termination. Def.'s Ex. A–8.

Amoco has an employee handbook called Amoco's Operating Policies for Hourly–Rate Employees, Northwestern Business Unit, dated January 1992. In a chapter titled "ARTICLE 8—Absences" the Handbook provides:

The Company recognizes that situations will arise when an employee must be away from his/her regularly assigned duties. The following sections set forth the conditions under which such absences will be approved and the pay status in which the employee will be placed during the absence.

Section A: Excused Absence With Pay

\* \* \* \* \* \*

5. Nonoccupational Illness or Injury. An employee who is absent from work because of a nonoccupational illness or injury will, if eligible, be paid for such time in accordance with the relevant provisions of the Sickness and Disability Plan. An employee not eligible to receive S & D benefits, or one who has exhausted such benefits, will not be paid for time lost.

\* \* \* \* \* \*

Section C: Leave of Absence

\* \* \* \* \* \*

2. Medical. A medical leave of absence can be granted for illness, pregnancy, or physical or mental incapacitation which prevents an employee from performing his/her regularly assigned duties. If approved, the leave will be given for an initial period not to exceed 90 days.

\* \* \* \* \* \*

Pl.'s Ex. A.

The Handbook also contains the following:

APPENDIX B

NOTICE TO ALL EMPLOYEES Offenses For Which Employees May be Subject to Discharge Without Prior Notice:

\* \* \* \* \* \*

2. Fighting with or threatening any other employee in the facility.

\* \* \* \* \* \*

10. Use of profane or abusive language directed at any other person while on Company property or in the course of performing Company work.

\* \* \* \* \* \*

11. Absence from duty without notice and permission from the employee's immediate supervisor.

\* \* \* \* \* \*

18. Harassing or intimidating any other employee. Includes but is not limited to verbal or physical conduct which interferes with an employee's work performance or creates an intimidating, hostile or offensive work environment.

OTHER OFFENSES

The above list of offenses is not intended to be all inclusive. Some other offenses may also be of such nature as to warrant suspension or discharge without prior notice.

*Id.*

Plaintiff went to see Ms. Boyer under Amoco's Employee Assistance Program, which was included in the Operating Polices. This program was apparently called Peeps. Amoco presented this program to its employees through a booklet stating as follows:

ASSURED HEALTH SYSTEMS, INC. PRESENTS: A comprehensive Employee Assistance Program for the Employees and Their Families of: AMOCO PRODUCTION COMPANY DENVER REGION

INTRODUCTION. In today's rapidly moving, high-tech environments, people are feeling stresses which they may not have experienced before—stresses generated at the workplace, and frequently, in the home. No matter how we try to separate our work and or home, problems seem to be carried in both directions, frequently causing severe emotional stress. Your employer knows this, and has contracted with our company to provide you and your immediate family with the most comprehensive Employee Assistance Program in this area. We are committed to making a professionally staffed program available to you—one which is sensitive and responsive to your needs, and one dedicated to the maintenance of confidentiality for your complete protection.

WHAT IS AN EMPLOYEE ASSISTANCE PROGRAM? It is a program designed to help you solve personal problems which may affect your personal work life in a negative ... In today's increasingly complicated world, progressive companies realize that their employees face stresses which they may not have encountered in the past ... tensions from work are carried home, and problems from home show up at work. Sometimes we can fix our personal problems with the help of family or friends, but sometimes the world gets to be too much, emotional stress occurs, and things begin to fall apart. That's the reason that your employer is providing our services—we are trained to listen, and recommend options which will help you resolve your special problem.

WHEN SHOULD I USE YOUR SERVICE? Use it as soon as you need it! Problems don't go away—they just compound themselves, and you'll soon notice their effect on your job, and during your off-job time. We can help with all sorts of personal problems like high levels of stress[.] ... You don't need to feel trapped in a situation you can't solve .... we're here to help you!

WILL ANYONE ELSE KNOW ABOUT THIS? No! Not unless you tell them. If your supervisor has referred you to us, he is told only what you authorize us to tell him. **If your problem has already affected your job performance, your participation in our program will neither cause nor prevent company disciplinary action—should such have been planned.**

HOW MUCH DOES THIS COST ME? Your employer has contracted with us to

provide comprehensive assessment and referral at no cost to you. If you and we feel that additional sessions are necessary, the cost will be your responsibility ... Remember! Call us if you need us ... we're here to help you.

Pl.'s Ex. B (bold emphasis added).

Sometime after the termination letter plaintiff applied for and received an undetermined amount of benefits under Amoco's temporary disability plan. Pl.'s depo at 522–23.

On May 10, 1993, plaintiff filed a Charge of Discrimination with the EEOC and alleged he was terminated on the basis of discrimination against his mental disability in violation of the Americans With Disabilities Act. Def.'s Ex. D. The EEOC found no violation. Def.'s Ex. E. Plaintiff did not pursue further action on his claim that Amoco violated the ADA.

## STANDARD FOR REVIEW OF MOTION FOR SUMMARY JUDGMENT

This court must grant summary judgment if "the pleadings, depositions, ... and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A 'material' fact is one 'that might affect the outcome of the suit under the governing law.'" *Farthing v. City of Shawnee,* 39 F.3d 1131 (10th Cir.1994) quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). And "a 'genuine' issue is one where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* "The moving party bears the initial burden of showing that there is an absence of any issues of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Duart v. FMC Wyoming Corp.,* 859 F.Supp. 1447, 1454 (D.Wyo.1994). "If the moving party meets this burden, the nonmoving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case." *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). "To sustain this burden, the non-moving party cannot rest on the mere allegations in the pleadings." *Id.* citing Fed.R.Civ.P. 56(e) and *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. In considering whether there are material facts the court "examines all evidence in the light most favorable to the non-moving party." *Duart,* 859 F.Supp. at 1454.

## DISCUSSION AND CONCLUSIONS

As noted above, Plaintiff brings three claims under Wyoming law: wrongful termination, breach of contract, and breach of the covenant of good faith and fair dealing.

Defendant moves for summary judgment and contends as follows. Plaintiff's claim for "wrongful termination" is not a valid claim under Wyoming law. Plaintiff's claim of breach of contract based upon the employee handbook fails as a matter of law because defendant complied with all applicable provisions of its employee handbook in terminating plaintiff. In addition, defendant contends that the breach of contract claim also fails because to the extent that plaintiff claims that he could be terminated only for cause, there is no evidence that the reasons for his termination were false or pretextual. Defendant contends that there are no rare and exceptional circumstances in this case to support a claim for breach of the implied covenant of good faith and fair dealing. In addition, defendant contends that plaintiff's claims for emotional and mental injuries are barred by the exclusive remedy provisions of the Worker Compensation Act. Finally, defendant contends that to the extent that plaintiff contends that its actions were motivated by plaintiff's alleged union organizing activities, his claims are barred by the National Labor Relations Act.

As an initial matter the court notes the applicable law.

In this diversity case, this court must apply the applicable state law, the law of Wyoming. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (when sitting in diversity, federal court must apply law of forum state as declared by that state's highest court or legislature).

*Sinclair v. Republic,* 967 F.Supp. 462, 469 (D.Wyo.1997).

## A. Breach of Implied in Fact Contract

■ Plaintiff's complaint alleges that by virtue of its Handbook, Amoco established a contract with plaintiff such that he could be terminated only for cause. In his opposition to the Motion for Summary Judgment plaintiff clarifies that he contends that the employee handbook and the Peep program and its brochure together created an implied contract. His brief also clarifies that he does not claim that the progressive discipline of the handbook was violated procedurally.

■ Wyoming retains the presumption that employment is at-will. *Loghry v. Unicover,* 878 P.2d 510, 512 (Wyo.1994). Under at-will employment, an employer may fire an employee "at any time for any reason or without reason." *Mobil Coal Producing, Inc. v. Parks,* 704 P.2d 702, 704 (Wyo.1985).

The Wyoming Supreme Court has recognized, however, that the distribution of employee handbooks or manuals may supply terms for an implied in fact contract of employment. *Lincoln v. Wackenhut Corp.,* 867 P.2d at 703. "[A] systematic discipline procedure or other language in an employee handbook implying termination may be for cause only may defeat the rebuttable presumption that employment is at will." *Id., citing Sanchez v. Life Care Centers of America, Inc.,* 855 P.2d 1256, 1257 (Wyo.1993). Also listing certain conduct for which an employee may be discharged implies that cause is required before discharge, thus creating an implied employment contract. *Leithead v. American Colloid Co.,* 721 P.2d 1059, 1063 (Wyo.1986). This is not to say that the existence of a handbook will make employment other than at-will in all instances; rather, each case must be considered on its own merits. *Mobil Coal,* 704 P.2d at 706.

*Duart v. FMC Wyoming Corp.,* 859 F.Supp. 1447, 1459 (D.Wyo.1994).

In this case, the portions of the handbook that have been submitted on summary judgment do list misconduct that could result in discharge and therefore implies that cause is required. However, the dispositive facts on plaintiff's claim of breach of contract are not disputed. Plaintiff does not dispute defendant's evidence that he broke at least three of the listed rules, violation of any one of which was grounds for immediate dismissal. Thus, the undisputed facts establish that Amoco had cause, as defined in the handbook, to discharge plaintiff. Thus, defendant is entitled to judgment on this claim.

■ To the extent that plaintiff contends that the brochure or his participation in the Peeps program create an implied contract the court rejects that argument. To begin with, although he requested a brochure and enrolled in the program, plaintiff cannot remember if he actually received the brochure. Pl.'s depo at 330–31. Further, the brochure clearly notifies all employees that "... your participation in our program will neither cause nor prevent company disciplinary action ..." Further, the court has reviewed the entire brochure and finds that it does not create an implied contract. The statements in the brochure are general policy statements encouraging employees to take advantage of a counseling program. Such statements do not create an implied contract that the employee will not be terminated or otherwise disciplined while he or she is participating in the program. Similarly, they do not create an implied contract that any conduct arising from an alleged mental illness will be excused simply because of the fact of an employee's participation in the program. To so hold would completely remove any incentive for an employer to provide such a program. To the extent that plaintiff contends that he had a mental illness of which defendant was aware and refused to accommodate, his exclusive remedy was under the Americans With Disabilities Act.

■ In his Brief in Opposition, plaintiff makes an oblique argument that his breach of contract claim also relies on the doctrine of promissory estoppel. pp. 20–21.

Unfortunately, the Wyoming Supreme Court has not clearly held whether promissory estoppel applies in the at-will employment context. *See Wilder v. Cody Country Cham-*

*ber of Commerce,* 933 P.2d 1098, 1106 n. 2 (Wyo.1997).

A claim for promissory estoppel is not clearly pleaded in plaintiff's complaint. Further, the court finds that plaintiff's allegations do not state a claim for promissory estoppel.

■ The court finds that the unilateral demand by plaintiff, his wife and their counselor that he be provided a stress-free environment could not create a binding promise between plaintiff and his employer that he would be granted such an environment. Especially in view of the undisputed fact that when confronted with the unilateral demand, plaintiff's supervisor expressly told him that it was not possible for him to be granted such a thing as stress-free work environment. It is also undisputed that plaintiff was asked if he could continue working in a non-stress free environment and that he stated he was trying to.

In conclusion, the court finds that promissory estoppel, if there is such a claim under Wyoming employment law, could not apply on the undisputed facts before the court on summary judgment. The plaintiff having failed to come forward with facts that show genuine issues of fact on his claims of breach of implied contract or promissory estoppel, the court will grant defendant summary judgment on these claims.

### B. Breach of the Covenant of Good Faith and Fair Dealing

The Wyoming Supreme Court has recently reiterated its position on claims for breach of the covenant of good faith and fair dealing.

As noted earlier, Wyoming recognizes a limited tort claim for breach of an implied covenant of good faith and fair dealing in employment contracts. *Wilder [v. Cody Country Chamber of Commerce ],* 868 P.2d [211] at 221 [ (Wyo.1994) ]. When a special relationship of trust and reliance is demonstrated to exist and reliance is demonstrated to exist between the employee and employer, a breach of the duty of good faith and fair dealing is actionable. *Wilder,* 868 P.2d at 222. Only in rare and exceptional cases will a duty be created giving rise to

tort liability. *Wilder,* 868 P.2d at 221. Trust and reliance may be found by the existence of separate consideration, common law, statutory rights, or rights accruing with longevity of service. *Wilder,* 868 P.2d at 221.

*Loghry v. Unicover Corp. (Loghry II),* 927 P.2d 706, 712 (Wyo.1996).

■ In the present case plaintiff contends that the special relationship and consideration exist because of the right of the employee to take, and of the employer to grant, medical leave. Plaintiff further contends that the following things were consideration within the meaning of *Wilder.* One, that he acted in reliance on the brochure for assurances that he would not be discharged for a mental illness covered by the program. Two, he contends that he suffered detriment because he relied upon the program when he communicated his problems to his supervisors. Further, plaintiff contends that a special relationship arose from two other circumstances. First, his participation in the program as establishing a relationship of trust and confidence between himself and his employer. Second that he worked for the company for seventeen years.

■ The court finds that none of these contentions, nor all of them together show the creation of the rare and exceptional relationship of trust and confidence within the meaning of *Wilder.* As noted above, the court has found that the brochure did not promise special consideration for persons in the program and in fact clearly warned that participation would not prevent disciplinary action. Plaintiff's next contention that he suffered detriment because in reliance upon the program promises he communicated his problems to his supervisor who then fired him. This ignores the undisputed evidence of plaintiff's violations of the rules whereby he could be immediately terminated. Further, as already noted, plaintiff had a remedy, the ADA, for his claim that he was fired because his supervisors found out he had a mental illness.

■ This court must reject out of hand plaintiff's claim that his participation in the program created a special relationship within

the meaning of *Wilder*. If that were true then a *Wilder*-type relationship would be created with an employer every time an employee chose to take advantage of a program to provide assistance for mental and emotional health—a position that is prohibited by *Wilder*'s clear limiting of the relationship to "rare and exceptional" cases. Finally, the court notes that longevity of service alone does not create a *Wilder* relationship.

 Plaintiff did not request sick leave at any time before his undisputed violation of several of the rules listed in Appendix B to his employee handbook. Thus, there can be no issue of deprivation of sick leave as creating a special relationship where plaintiff did not request sick leave until after his outburst on his last day at work. That outburst violated the rules and provided cause for his discharge, any requests for sick leave subsequent to that are irrelevant. Accordingly, the availability of such sick leave cannot be used to create a special right to avoid the consequences of such violations.

Because the court finds as a matter of law that plaintiff has not come forward with evidence that could show the creation of a special relationship within the meaning of *Wilder*, the court will grant defendant summary judgment on this claim.

**C. Wrongful Termination**

Plaintiff's claim of wrongful termination is a restatement of his claims of breach of contract and breach of the covenant of good faith and fair dealing. Plaintiff acknowledges that Wyoming law currently has no case law creating a cause of action for "wrongful termination" per se. In plaintiff's complaint he sets forth his wrongful termination claim as follows.

COUNT 1—WRONGFUL
TERMINATION

\* \* \* \* \* \*

28. By virtue of its Handbook, AMOCO established a contract of employment with SEARS such that SEARS could be terminated only for cause.

29. As a result of his longevity with the company and the special relationship of trust and confidence created by SEARS' participation in the PEEPS Program, AMOCO created an obligation and commitment to SEARS such that AMOCO could not terminate SEARS' employment other than for cause.

30. On October 12, 1992, AMOCO wrongfully terminated SEARS without cause.

Complaint at ¶¶ 128 through 30.

As noted above, plaintiff fails to raise a genuine issue of fact to show that Amoco did not have cause, as defined in the handbook, to discharge him.

The court agrees with defendant that plaintiff's Brief in Opposition to the motion for summary judgment seeks to amend this claim and change it to claim for wrongful termination in violation of state and public policy. Plaintiff's Brief in Opposition to Motion for Summary Judgment p. 22–25.

Plaintiff's position is that this court should create a new cause of action tailored to fit his allegations. Plaintiff relies on the landmark case of *Griess v. Consolidated Freightways Corp.*, 776 P.2d 752, 754 (Wyo.1989), where the Wyoming Supreme Court created a tort action by an employee for retaliatory discharge for exercising rights under the workers' compensation statutes. From that case, and cases from other jurisdictions where the courts have recognized a public policy exception to the at-will employment doctrine, plaintiff seeks to create a cause of action for firing in retaliation for succumbing to a mental illness.

Plaintiff has not sought leave to amend, and leave would not be granted at this point in the case where discovery is complete and dispositive motions are pending.

Further, to the extent that this court would entertain a motion to amend at this late date, where the Wyoming Supreme Court has not recognized the cause of action urged by plaintiff, this court would have the difficult task of determining how it would rule.

Recognizing that the Wyoming Supreme Court has not spoken on this issue, this court must determine how it believes that

court would rule if confronted with the question. *Jacobs v. Dista Products Co.,* 693 F.Supp. 1029, 1031 (D.Wyo.1988) (where no controlling state law, federal court must make its "best estimate" of how state's highest court would rule). In making this determination, this court considers state court decision, decisions of other states, federal decisions, and the general weight and trend of authority. *Armijo v. Ex Cam, Inc.,* 843 F.2d 406, 407 (10th Cir.1988). *Sinclair, supra.*

The Wyoming Supreme Court did recognized a cause of action premised on violations of public policy in *Griess,* holding that there an exception to the general rule of at-will employment in the context of a tort action for retaliatory discharge if the action is premised on a violation of public policy, in that case a discharge for filing a claim for worker's compensation. 776 P.2d at 753. However, the same court had earlier explained an important limit on the circumstances where it would consider such actions.

A tort action premised on violation of public policy results from a recognition that allowing a discharge to go unredressed would leave a valuable social policy to go unvindicated. If there exists another remedy for violation of the social policy which resulted in the discharge of the employee, there is no need for a court-imposed separate tort action premised on public policy. *Viestenz v. Fleming Companies, Inc.,* 681 F.2d 699 (10th Cir.1982), cert. denied 459 U.S. 972, 103 S.Ct. 303, 74 L.Ed.2d 284. As said in *Wehr v. Burroughs Corporation,* 438 F.Supp. 1052, 1055 (D.C.Pa.1977):

It is clear then that the whole rationale undergirding the public policy exception is the vindication or the protection of certain strong policies of the community. If these policies or goals are preserved by other remedies, then the public policy is sufficiently served. Therefore, application of the public policy exception requires two factors: (1) that the discharge violate some well-established public policy; and (2) that there be no remedy to protect the interest of the aggrieved employee or society.

*Allen v. Safeway Stores Incorporated,* 699 P.2d 277, 284 (Wyo.1985) (citations partially omitted).

In *Allen* the Wyoming Supreme Court declined to allow a claim for termination in violation of public policy where the employee had a remedy under the Wyoming Fair Employment Practices Act. *Id.* The above-quoted language from *Allen* was relied upon this court in *Bintner v. Burlington Northern, Inc.,* 857 F.Supp. 1484, 1490 (D.Wyo.1994). In *Bintner* this court declined to "fashion a 'public policy' remedy" for an employee plaintiff "when remedies are already available for vindication of [that] plaintiff's sex discrimination claims." *Id.* at 1491.

■ Similarly, in *Gustafson v. Bridger Coal Co.,* 834 F.Supp. 352, 354–55 (D.Wyo. 1993) the court held that the tort of retaliatory discharge as a public policy exception to the general rule of at-will employment was not available to a plaintiff who had an adequate remedy. *See also International Surplus Lines Ins. Co. v. University of Wyoming Research Corp.,* 850 F.Supp. 1509, 1529 (D.Wyo.1994) (Finding that the "clear import of *Allen* is that while 'court-imposed' remedies may be necessary in certain circumstances, they are an unwarranted exercise of the judicial prerogative when other avenues of redress exist.").

As stated previously by this court in *Bintner,* whether plaintiff is an at-will employee or whether he is covered by an implied contract created by the employee handbook is "not germane to the analysis set forth in *Allen.*" 857 F.Supp. at 1490. What is germane is whether he has a adequate remedy.

In this case, as in *Allen, Bintner,* and *Gustafson,* plaintiff had an adequate remedy to redress his allegations. That remedy is the Americans With Disabilities Act or the ADA. The ADA is a comprehensive national law enacted to provide a remedy for exactly the allegations that plaintiff now makes—that he was fired because he had a treatable mental illness.

Accordingly, even if this court were to allow an amendment to bring plaintiff's claims under a theory of violation of public

policy, such a claim would have to be dismissed.

## CONCLUSION AND ORDER

For the reasons stated above the court will grant defendant's Motion for Summary Judgment on plaintiff's three causes of action. Accordingly, the court need not reach defendant's contentions the plaintiff's claims are barred by the exclusive provisions of the workers' compensation statutes or by the National Labor Relations Act. Therefore it is

ORDERED that defendant Amoco Production Company's Motion for Summary Judgment IS **GRANTED.**