**John R. ROSS and Bessie Ross,
Appellants,**

v.

**William S. JACOBS, M.D.; William S. Jacobs, M.D., Inc., a corporation; American Cyanamid Company, a corporation; and Lederle Laboratories, a division of American Cyanamid Company, Appellees.**

**No. 59770.**

Court of Appeals of Oklahoma,
Div. No. 4.

March 20, 1984.

Released for Publication by Order of the Court of Appeals June 25, 1984.

W.C. Sellers, Sapulpa, and Gerald L. Michaud, Wichita, Kan., for appellants.

Wm. S. Hall, Feldman, Hall, Franden & Woodward, Tulsa, for appellees American Cyanamid Co. and Lederle Laboratories.

STUBBLEFIELD, Judge.

This is a medical malpractice/manufacturers' products liability case involving the question of the adequacy of the warning given to the physician and consumer regarding possible adverse effects of the prescription drug Myambutol. The defendant manufacturer moved for summary judgment, requesting the court to rule that its duty to warn was discharged by the warning of possible side effects given to plaintiff's physician. The trial court agreed and granted summary judgment. We reverse and remand.

## STATEMENT OF FACTS

On August 13, 1979, while plaintiff, John R. Ross, was under the care of William S. Jacobs, M.D., the drug Myambutol was prescribed for Mr. Ross' treatment. Myambutol (ethambutol hydrochloride) was manufactured and marketed by the Lederle Laboratories Division of American Cyanamid Company. Mr. Ross continued on Myambutol (administered concurrently with other medication) until mid-December, 1979. At that time, Mr. Ross reported a loss of vision to Dr. Jacobs, which had arisen two or three days earlier. The doctor terminated the administration of Myambutol.

Ross' vision did not improve even though the drug use had been discontinued. His vision, indeed, continued to deteriorate. On later testing his vision was found to be 20/400, a visual impairment greater than that which constitutes legal blindness. Prior to the drug therapy, Ross' vision had tested as 20/25.

On August 6, 1981, Ross and his wife, Bessie Ross, filed an action against Dr. Jacobs for alleged medical malpractice. On November 5, 1981, an amended petition was filed which also named American Cyanamid (Cyanamid) and Lederle Laboratories (Lederle) as parties defendant. In a third amended petition filed January 6, 1983, the following allegations were made against Cyanamid and Lederle:

"a. That defendants Cyanamid and Lederle failed to adequately warn the medical profession and defendant Jacobs that the use of Myambutol was likely to cause a condition known as 'optic neuritis' and hence carry the specific risk of loss of permanent vision; that any warnings which were given by defendants Cyanamid and Lederle concerning this unreasonably dangerous side effect caused by the taking of Myambutol were ambiguous, incomplete, inadequate, watered-down, and lacked emphasis commensurate with the risks involved.

"b. That the means by which defendants Cyanamid and Lederle undertook to warn the medical profession and defendant Jacobs concerning this unreasonably dangerous side effect caused by the administration of Myambutol were inadequate to effectively convey said warnings;

"c. That defendants Cyanamid and Lederle negligently failed to offer more detailed and pronounced warnings concerning this dangerous side effect caused by the administration of Myambutol, or in the alternative, remove their product from the market, after having received numerous complaints in the past concerning the adequacy of the warnings given and the resulting blindness of others.

"d. That defendants Cyanamid and Lederle negligently failed to additionally test and investigate the extent of the dangerous propensities associated with the administration of Myambutol;

"e. That defendants Cyanamid and Lederle negligently failed to maintain current information gathered from research adverse reaction reports, scientific literature, and other available methods

concerning the incidents of permanent blindness caused from the taking of Myambutol."

The defendants, Cyanamid and Lederle, filed a motion for summary judgment, seeking a ruling that the warning given by them to Dr. Jacobs was sufficient as a matter of law to discharge their duty to warn of possible adverse consequences of the use of the drug. The trial court, on September 27, 1983, ruled that the warning of Cyanamid and Lederle had met "the requirements under Oklahoma case law as to the warning manufacturers should give for use of this type of material," and dismissed them from the lawsuit. Plaintiffs appeal.

## I

In review of a motion for summary judgment it is first helpful to restate the applicable rules regarding our scope of review.

■ Summary judgments, although promoting the highly desirable goal of efficiency in our court system, are looked upon with disfavor by the court, as they prevent litigants from having their day in court, and, if improperly utilized, could result in a miscarriage of justice. "Such [summary] judgments partake of the nature of judgments on the pleadings which are not favored by the courts, and should only be entered where no issue is joined." *Love v. Harvey,* Okl., 448 P.2d 456 (1968); see also *Atchison, Topeka and Santa Fe Ry. v. Coulson,* Okl., 371 P.2d 914 (1962).

The critical issue here, and the one presented in plaintiffs' sole proposition of error, is whether the trial court's factual determination as to the adequacy of the manufacturer's warning was correct.

The trial court, in its ruling, stated that "[g]oing on the criteria in the *Moore* case [*McKee v. Moore,* Okl., 648 P.2d 21 (1982)], I'm finding that this meets the requirements under Oklahoma case law as to the warning manufacturers should give for use of this type of material." The court's ruling additionally relied on the fact that Dr. Jacobs did not follow the recommended procedures and dosage listed in the manufacturer's warning. The latter argument apparently implies that the manufacturer is further removed from potential liability by the doctor's disregard of the warning. The conclusion, though not well elucidated by the trial court, seems to be that the warning, adequate or not, was not followed by the physician and that this intervening negligence would preclude manufacturer's liability.

■ In reviewing the *McKee (Moore)* case relied upon by the trial court, we conclude that *McKee* does not establish criteria for determining adequacy of warning. *McKee* merely stands for the proposition that (unless required by Food and Drug Administration rules) it is not necessary for manufacturers of prescription drugs to warn the ultimate consumer of possible adverse side effects from the drug's use. *Adequate* warnings to the physician fulfill the manufacturer's duty to warn. Any warning given to physicians, however, is not sufficient. It must be adequate.

Here, plaintiffs complain that the warning to the physician was not adequate. Plaintiffs allege that the warning given to Dr. Jacobs was inadequate and misleading, and tended to downplay possible adverse consequences of use of the drug. We, therefore, do not find *McKee* dispositive. *McKee* clearly approves of a warning to the physician as opposed to a direct warning to the consumer, but offers no help in ascertaining whether the warning of Cyanamid/Lederle was *adequate* so as to fulfill the duty to warn of the possibility of adverse effects from use of the product. There is no dispute as to what warning was given, but was it, as a matter of law, adequate to warn physicians of a known danger?

■ The test for determining the propriety of a summary judgment where the facts are not in dispute, but the conclusions to be drawn from them are, was set out by the Oklahoma Supreme Court in *Stuckey v. Young Exploration Co.,* Okl., 586 P.2d 726 (1978):

"If reasonable men in the exercise of fair and impartial judgment might reach dif-

ferent conclusions upon consideration of pleadings, affidavits, exhibits, admissions, depositions and the like, summary judgment is improper."

The critical question then is whether a genuine issue exists as to the inferences or conclusions that may be properly drawn from the evidence. These inferences must be viewed in the light most favorable to plaintiffs and the judgment reversed if inferences contrary to those drawn by the trial court might be permissible. *Salmon v. Parke, Davis and Co.*, 520 F.2d 1359 (4th Cir.1975).

A review of the warning from the perspective of a reasonable man to determine its adequacy requires consideration of several facets of the problem. It requires consideration of the warning in the context of what dangers the manufacturer knew existed. Likewise, the manufacturer's response to the developing body of information regarding adverse drug reactions is important. Was the modification of the warning made by manufacturer a reasonable response to newly acquired knowledge?

There is little existing Oklahoma case law to further guide our examination. Some help, however, can be gained from other jurisdictions' attempts to deal with the issue.

We initially conclude that most courts have been reluctant to decide adequacy of warning as a matter of law. It has generally been left for resolution by the trier of fact. *Richards v. UpJohn Co.*, 95 N.M. 675, 625 P.2d 1192 (Ct.App.1980); *McFadden v. Haritatos*, 86 A.D.2d 761, 448 N.Y. S.2d 79 (1982).

But when courts have been required to delve into the adequacy of warning (generally to ascertain the propriety of a summary judgment such as we are faced with here) certain criteria have been established that additionally guide our inquiry. Many courts have judged warning adequacy based upon a determination of whether the warning, "under all the circumstances ... reasonably discloses to the medical profession all risks inherent in the use of the drug which the manufacturer knew or should have known to exist." *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). See also *Smith v. E.R. Squibb & Sons, Inc.*, 405 Mich. 79, 273 N.W.2d 476 (1979); *McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522 (1974). A warning has been found to be unreasonable in that it was unduly delayed, reluctant in tone, or lacking in a sense of urgency. *Sterling Drug, Inc. v. Yarrow*, 408 F.2d 978 (8th Cir.1969).

In *Richards v. UpJohn Co.*, 625 P.2d at 1196, the New Mexico Court of Appeals listed five "relevant standards concerning the adequacy of warning about a dangerous drug" and went the furthest toward fixing criteria for judging drug warning adequacy. The standards are:

"1. the warning must adequately indicate the scope of the danger;

2. the warning must reasonably communicate the extent or seriousness of the harm that could result from misuse of the drug;

3. the physical aspects of the warning must be adequate to alert a reasonably prudent person to the danger;

4. a simple directive warning may be inadequate when it fails to indicate the consequences that might result from failure to follow it and ...

5. the means to convey the warning must be adequate. In other words, the drug manufacturer must bring the warning home to the doctor."

All of these standards give us a perspective from which to view the warning given here by the manufacturer, but it is important to remember that we need not conclude that the warning given by Cyanamid/Lederle was inadequate in order to reverse the summary judgment. We need only conclude that the issue is one where reasonable men could differ. A close scrutiny of the warning given is necessary.

Myambutol was first marketed in 1967. The initial warning given by the manufacturer in the insert and published in the PDR contained the following language:

"MYAMBUTOL [Ethambutol] may produce decreases in visual acuity which appear to be due to optic neuritis and to be related to dose and duration of treatment. Approximately 6 percent of patients who have received MYAMBUTOL [Ethambutol] have exhibited decreases in visual acuity, and these decreases are apparently reversible when the drug is discontinued. In controlled studies, the frequency and magnitude of decreases in visual acuity among patients being treated with ethambutol were no higher than among patients on regimens not containing ethambutol.

" . . . .

" . . . If careful evaluation confirms the magnitude of visual change and fails to reveal another cause, MYAMBUTOL [Ethambutol] should be discontinued and the patient re-evaluated at frequent intervals. Progressive decreases in visual acuity during therapy must be considered to be due to MYAMBUTOL [Ethambutol].

" . . . .

"Recovery of visual acuity generally occurs over a period of weeks to months after the drug has been discontinued. Patients have then received MYAMBUTOL [Ethambutol] again without recurrence of loss of visual acuity." (footnotes omitted)

In 1976 the warning was changed. The principal change was the substitution of the following language for that found in the first paragraph above:

"MYAMBUTOL may produce decreases in visual acuity which appear to be due to optic neuritis and to be related to dose and duration of treatment. The effects are generally reversible when administration of the drug is discontinued promptly. In rare cases recovery may be delayed for up to one year or more and the effect may possibly be irreversible in these cases."

The answers to interrogatories indicate that the change came one year after the manufacturer began maintaining files containing reports and complaints of eye damage and blindness thought to be caused by the drug.

The warning, as modified in 1976, remained unchanged through the date of use by plaintiff Ross. We note that even though language was used in 1976 mentioning possible irreversible eye damage, the warning regarding damage to eyesight continued to conclude:

"Recovery of visual acuity generally occurs over a period of weeks to months after the drug has been discontinued. Patients have then received MYAMBUTOL again without recurrence of loss of visual acuity."

Aside from the warning itself we need to examine the evidence concerning the manufacturer's knowledge of the danger of the product. The answers to interrogatories include a response to plaintiffs' request for a list of all claims and/or reports that the manufacturer had received wherein it was claimed that Myambutol had caused eye damage or blindness. The response is a computer print-out with minimum detail that lists the drug (Myambutol in all cases), the complaint or stated adverse effect, and the doctor or patient submitting the complaint. The first entry was dated 11–1–75, and the last 5–18–82. Between the time of the first *recorded* complaint and that of Dr. Jacobs occurring on 10–26–81 were 17 complaints involving visual impairment. There is far too little information given to adequately ascertain the severity of any of these cases, but two instances are listed as blindness, one as total loss of vision, one as severe loss of vision, and three as visual loss. This information lends some credence to the argument that the use of the drug was resulting in permanent loss of vision in a significant number of instances.

Arguably the conclusion of the 1976 version of the warning quoted above is misleading and fails to adequately warn of a known danger. The language of the warning itself may be considered ambiguous. The language used above, "which appear to be," could easily be interpreted to mean that the decreases in visual acuity are really not due to optic neuritis and related to

dosage and duration of treatment with Myambtol, but only appear to be. Additionally, the use of the language concerning possible irreversible damage, when examined in context, is highly ambiguous. There seems little commitment to admit a true danger of permanent visual loss, even though the manufacturer appears to have known of a growing number of cases of permanent visual loss or blindness.

We further note that the affidavits, answers to interrogatories, etc., do not address the issue raised in plaintiffs' third amended petition that the manufacturer did not satisfactorily investigate and maintain data concerning possible adverse effects of Myambutol. The only real evidence in that regard is the indication in answers to interrogatories that manufacturer maintained no "complaint" files until November 1975, even though the product had been marketed since 1967. The answer may simply be that there were no complaints from 1967 to 1975. However, from the data in support of the motion we are unable to make any conclusion one way or the other. The issue still remains.

After a total examination of the record and the evidentiary materials offered in support and contravention of the motion for summary judgment, we conclude that reasonable men in exercise of their fair and impartial judgment could find that the warning given by the manufacturer Cyanamid/Lederle was inadequate to warn of a known danger or one that should have been known by the manufacturer.

## II

As previously stated, the court's order sustaining summary judgment, though not totally clear, also appears to be partially premised on a finding or belief that the negligence of Dr. Jacobs would somehow preclude the manufacturer's liability. The doctor, in his deposition, had admitted departing from the eye testing procedures and dosage recommendations of the manufacturers. The court appears to have seized upon this as a bar to liability on the part of the manufacturer, concluding that the warning, even if inadequate, was not the proximate cause of Mr. Ross' injury.

Just as courts have been reluctant to determine warning adequacy as a matter of law, so have they been reluctant to rule, as a matter of law, that a physician's acts of negligence constitute an intervening cause which would exonerate a manufacturer from liability. If the doctor's acts were reasonably foreseeable, then the drug company is not exonerated from liability. Furthermore, the issue of foreseeability, and thus the question of whether the doctor's use of the drug constituted an independent intervening cause, should go to the jury. *Richards v. UpJohn Co.,* 95 N.M. 675, 625 P.2d 1192 (Ct.App.1980).

The doctor testified in his deposition that if a stronger warning had been given that he would have been less apt to prescribe the drug. It is additionally arguable that the doctor's deviation from the suggested medical practices and dosage would have been less likely with a warning clearly advising of a real risk of blindness.

Here, also, the question has to do with what reasonable men might conclude. Based upon the evidence offered in regard to the motion for summary judgment we feel that the question of manufacturer's negligence, even in light of the doctor's admitted shortcomings, is for determination by a jury.

For the foregoing reasons we reverse the order sustaining manufacturer's motion for summary judgment and remand the matter to the trial court for further proceedings.

DeMIER, P.J., and MEANS, J. (sitting by designation), concur.